IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD HIGBIE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:11-CV-2636-L** |
| | § | |
| JOHN KERRY, | § | |
| In his official capacity as Secretary of State, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendant's Motion for Summary Judgment (Doc. 82), filed June 17, 2013; and Defendant's Motion to Exclude Improperly-Obtained Documents (Doc. 79), filed June 10, 2013. After careful consideration of the motions, responses, replies, record, and applicable law, the court **grants** Defendant's Motion for Summary Judgment; and **denies as moot** Defendant's Motion to Exclude Improperly-Obtained Documents.

## I.    Background

Richard Higbie ("Higbie" or "Plaintiff") filed this action against Hillary Rodham Clinton, in her capacity as United States Secretary of State, on October 5, 2011. On September 12, 2013, Higbie filed Plaintiff's Third Amended Complaint (the "Complaint") (Doc. 123), the live pleading, against John Kerry, in his capacity as Secretary of State.[1] Plaintiff seeks damages for retaliation pursuant to Sections 501 and 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act ("ADA"), and Title VII of the Civil Rights Act of 1964.

---

[1] John Kerry is the successor to Hillary Rodham Clinton as United States Secretary of State, and he is automatically substituted as a party to this action. Fed. R. Civ. P. 25(d).

Plaintiff is currently a "Senior Criminal Investigator / Senior Special Agent" located in the Dallas Resident Office within the Bureau of Diplomatic Security. The Dallas Resident Office operates under the direction of the Houston Field Office. In 2001, Plaintiff filed an EEO complaint out of which this matter arises.[2] Plaintiff settled this 2001 complaint on July 11, 2005. The settlement specified that Plaintiff's position within the Department would change from the Foreign Service to the Civil Service within the Bureau of Diplomatic Security in the Dallas Resident Office. In August 2007, Plaintiff informed the Special Agent in Charge of the Houston Field Office, Marian Cotter ("Cotter"), about his 2001 EEO complaint. In February 2008, Plaintiff also told the Resident Agent in Charge of the Dallas Resident Office, Edward McGrath ("McGrath"), about the 2001 complaint.

Plaintiff contends that on December 17, 2008, Defendant refused to allow him to serve as the acting Resident Agent in Charge in Dallas or lead teams on complex investigations. Plaintiff also contends that, in January 2011, Defendant took away his title, rank, and the duties, responsibilities, and privileges that came with his title and rank. Plaintiff also argues that Defendant removed his duty of serving as the primary liaison to Consular Affairs in March 2011. Finally, Plaintiff contends that Defendant has continued to create a retaliatory hostile work environment. Plaintiff argues that Defendant fails to assert any legitimate, nonretaliatory reasons for these retaliatory actions.

Plaintiff states that, between January and June of 2008, and then later in December 2008, he openly voiced opposition to the alleged discriminatory acts committed by officials in the Houston Field Office. On April 13, 2009, Plaintiff filed an EEO complaint involving Cotter and the Assistant

---

[2] There are several other alleged instances that Plaintiff contends gave rise to Defendant's alleged retaliation; however, this 2001 EEO complaint was the first relevant instance to occur.

**Memorandum Opinion and Order - Page 2**

Special Agent in Charge of the Houston Office Paul Vallee ("Vallee").  Additionally, on August 22,

2011, Plaintiff filed an additional EEO complaint against Resident Agent in Charge of the Dallas

Office Cliff Taliaferro ("Taliaferro").

Defendant contends that it is entitled to summary judgment because no genuine dispute of

material fact exists regarding Plaintiff's claims of retaliation and retaliatory hostile work

environment.  Defendant argues that no reasonable trier of fact could conclude that Plaintiff's new

supervisors retaliated against him for his prior EEO complaints filed against different personnel years

earlier.  Defendant contends that Plaintiff cannot show any adverse employment action or any causal

link between his earlier EEO activity and the alleged retaliation.  Defendant also argues that Plaintiff

cannot refute the legitimate, nonretaliatory reasons for the complained-of actions.  Defendant finally

contends that Plaintiff's claim for "retaliatory hostile work environment" fails because the Fifth

Circuit does not recognize it as a cause of action and because Plaintiff cannot demonstrate any

adverse conduct that is severe or pervasive enough to create a hostile work environment.

## II.    Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas

Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine"

if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary

judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift*

*Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.* (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832

(1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id*.  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## III.   Retaliation Standard for ADA, Rehabilitation Act, and Title VII Claims[3]

It is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice" under Title VII, or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001).  Whether the employee opposes an unlawful practice or participates in a proceeding against the employer's activity, the employee must hold a reasonable belief that the conduct he opposed violated Title VII.  *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

To establish a *prima facie* case of retaliation in this circuit, a plaintiff must show that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (footnote

---

[3] While the standard herein set forth specifically focuses on retaliation claims under Title VII, the same analysis is used for retaliation claims brought under the ADA.  *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (setting forth a similar analysis for a retaliation claim under the ADA).  Additionally, the court determines that there is a clear indication that the Fifth Circuit intends the same standard to apply when analyzing retaliation claims under the Rehabilitation Act.  *See Shannon v. Henderson*, 275 F.3d 42, 2001 WL 1223633, at *3 (5th Cir. Sept. 25, 2001) (per curiam).

and citation omitted); *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)*; Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). The establishment of a *prima facie* case gives rise to an inference of retaliation. *Montemayor,* 276 F.3d at 692. This inference, in turn, shifts the burden of production to the defendant, who must then articulate a legitimate, nondiscriminatory, or nonretaliatory reason for the challenged employment action. *McCoy*, 492 F.3d at 557. Once a defendant articulates such a reason, the inference of discrimination or retaliation raised by the *prima facie* showing drops from the case. *Montemayor,* 276 F.3d at 692.

At this juncture, the plaintiff bears the burden of establishing that the employer's stated reason is a pretext for the real retaliatory purpose. *McCoy*, 492 F.3d at 557 (citation omitted). "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Tex. Sw. Med. Ctr. v. Nassar*, _____, U.S. _____, 133 S. Ct. 2517, 2533 (2013). If the employee fails to prove, or raise a genuine dispute of material fact, that the employer's real reason is a pretext for its allegedly retaliatory conduct, the defendant is entitled to summary judgment. *See McCoy*, 492 F.3d at 561-62.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, the Supreme Court held that, because the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. 53, 64 (2006). Consistent with this view, the Court held that a plaintiff claiming retaliation under Title VII must

show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citation omitted).  In so ruling, the Court rejected Fifth Circuit authority, *id.* at 67, which defined adverse employment actions as "ultimate employment decisions" and limited actionable retaliatory conduct to acts "such as hiring, granting leave, discharging, promoting, and compensating." *Id.* at 61 (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997)).  In evaluating whether actions are materially adverse, the Court went on to hold that "petty slights, minor annoyances, and simple lack of good manners will not" deter or dissuade a reasonable employee from making or supporting a charge of discrimination, and therefore they do not constitute conduct that is "materially adverse."  *Id.* at 68.

## IV.    Undisputed Facts

The following material facts are undisputed:

1.    Plaintiff joined the State Department as a Foreign Service employee in 1998.  He was assigned to the Bureau of Diplomatic Security and started in the Houston Field Office in 1999.  He then moved to the Dallas Resident Office in 2000.  The Dallas office is overseen by the Houston office.

2.    After Plaintiff's daughter was born in 1998, she became very ill.  Plaintiff sought to permanently move to Dallas for medical reasons.  Following this request, in 2001, Plaintiff asserted that he was discriminated against by Tim Haley ("Haley"), the Special Agent in Charge of the Houston Field Office.  Plaintiff's EEO charges were resolved in a settlement agreement in 2005.

3.    The settlement agreement converted Plaintiff to a Civil Service agent.  The title set forth in the settlement was "Criminal Investigator, GS-1811-13, Step 2."

4.    Haley left Houston in June 2002.  Additionally, the Dallas office received a new Resident Agent in Charge in September 2001 (Randy Steen); in September 2005 (Edward McGrath); in July 2008 (Laviris Stubblefield); and in November 2010 (Cliff Taliaferro).  The Houston Office also received a new Special Agent in Charge in August 2002 (Robert Starnes); in August 2005 (John Picardy); in July 2007 (Marian Cotter); in June 2009 (Peter Hargraves); and in April 2011 (George Nutwell).  The

Houston office also received a new Assistant Special Agent in Charge in August 2004 (Tedd Archabal); in July 2008 (Paul Vallee); and in September 2010 (Clint Taylor).

5.    Plaintiff's first retaliation allegations in this lawsuit begin in 2008.  At this time, Stubblefield was Higbie's direct supervisor; Cotter was the Special Agent in Charge of the Houston Field Office; and Vallee was the Assistant Special Agent in Charge.

6.    Plaintiff filed an administrative EEO complaint on April 13, 2009.  In this complaint, Plaintiff alleged that Cotter and Vallee were retaliating against him because of his previous EEO activity.

7.    In March 2011, Taliaferro asked Plaintiff to move back to the Dallas Resident Office's space on the seventh floor of the Earle Cabell Federal Building in Dallas. Plaintiff was previously physically located in the U.S. Passport Agency's office on the eleventh floor.

8.    On August 22, 2011, Plaintiff filed an additional EEO complaint.

## V.    Analysis

### A.    Prima Facie Case of Retaliation Under ADA, Rehabilitation Act, and Title VII Claims

#### 1.    Protected Activity

The first matter to be determined in a retaliation claim is whether Plaintiff engaged in a protected activity.  The court must determine whether Plaintiff opposed any unlawful employment practice or whether he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII, the ADA, or the Rehabilitation Act.  It is undisputed that Plaintiff engaged in a protected activity when he filed his EEO complaint in 2001 against the Department of State (specifically, Tim Haley).  Plaintiff also contends that between January and June of 2008, he "openly voiced opposition to discrimination" to Ed McGrath.  Pl.'s Resp. to Def.'s Mot. for Summ. J. 7-8.  Additionally, Plaintiff contends that he engaged in protected activity in January 2009.  Finally, it is clear that Plaintiff engaged in protected activity in April 2009

and August 2011 when he filed his additional EEO complaints.  The court will now review whether Plaintiff engaged in protected activity in January and June of 2008 and in January 2009.

Plaintiff contends that between January and June 2008, he "openly voiced opposition to discrimination" to Ed McGrath, his immediate supervisor at the time.  Plaintiff, however, notes that McGrath only explained to Cotter that Plaintiff "was previously involved in an EEO activity."  Pl.'s Resp. to Def.'s Mot. for Summ. J. 8.  Plaintiff cites to the EEO Investigative Affidavit of Cotter. Cotter clearly states that "at no time did RAIC McGrath report Mr. Higbie's expression of a hostile work environment."  App. to Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s App."), Ex. G at 8.[4] Additionally, Cotter never mentions that Higbie expressed his opposition to McGrath.  Plaintiff does, however, cite to his April 2009 Formal Complaint of Discrimination.  In this complaint, Plaintiff states that, in January 2008, he "informed his immediate supervisor, Ed McGrath, of instances related to a hostile work environment towards the complainant and other line-level employees . . . ."  *Id.*, Ex. F. at 5.  Nowhere does Plaintiff specifically cite an additional conveyance of his opposition between January and June 2008.  Since the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party, the court will view Plaintiff's conveyances to McGrath in January 2008 as a prior protected activity.

---

[4] Plaintiff failed to comply with the court's local rules as they relate to appendices.  Local Civil Rule 56.6(b)(3) states that "[e]ach page of the appendix must be numbered legibly in the lower, right-hand corner.  The first page must be numbered as '1,' and succeeding pages must be numbered sequentially through the last page of the entire appendix (*i.e.*, the numbering system must not re-start with each succeeding document in the appendix)."  While Plaintiff marked each exhibit with a letter, the individual pages are not marked with a consecutive number.  Plaintiff's failure to follow this rule caused the court to unnecessarily consume scarce judicial resources and waste a substantial amount of time attempting to locate evidence in the record that should have been provided consistent with the court's local rules.

In his Supplemental Declaration, Plaintiff also states that during the January 2009 management review, he "expressed openly [his] concerns that [he] was being retaliated against due to [his] prior protected activity, the fact that [he] was converted to a GS position as a result of the settlement in that prior lawsuit, and that Houston officials were discriminating against [him] because of [his] prior involvement in the lawsuit [he] brought and the subsequent settlement." *Id.*, Ex. A at 2. Again, since the court is required to resolve all disputed facts in favor of the nonmoving party, the court will view Plaintiff's statements in the January 2009 management review as protected activity.

For the reasons set forth in the preceding paragraphs, the court determines that Plaintiff engaged in protected activity in: (1) 2001; (2) January 2008; (3) January 2009; (4) April 2009; and (5) August 2011.

## 2.    Adverse Employment Actions

The second matter to be determined in a retaliation claim is whether Plaintiff experienced an adverse employment action following the protected activity. An adverse employment action is any action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *McCoy*, 492 F.3d at 559 (quoting *Burlington*, 548 U.S. at 68). Plaintiff narrows the adverse employment actions to three instances: (1) Defendant's refusal to permit Plaintiff to serve as the acting Resident Agent in Charge ("RAIC") in Dallas to lead teams on complex investigations in December 2008; (2) Defendant's alleged derogation of Plaintiff's employment by stripping him of his title and rank (and the duties, responsibilities, and privileges that come with such title and rank) in January 2011; and (3) Defendant's removal of Plaintiff's major job duty as the

primary liaison to Consular Affairs in March 2011.  The court now analyzes whether these three instances are adverse employment actions.

> **a.    Defendant's Alleged Refusal to Permit Plaintiff to Act as the RAIC**

Plaintiff contends that Defendant refused to permit him to act as the Resident Agent in Charge when the actual Resident Agent in Charge was away.  Plaintiff's title is a "Senior Criminal Investigator (GS-1811-13)."  Pl.'s App., Ex. B.  In Plaintiff's January 30, 2009 Civil Service Performance Plan and Appraisal, his rating official and reviewing official list "act[ing] as the Resident Agent-in-Charge (RAIC) as directed or in the absence of the assigned RAIC" as one of his work commitments.[5]  *Id.*, Ex. R.

Defendant contends that Plaintiff was not *barred* from acting as Resident Agent in Charge. Defendant argues that the duties of the acting Resident Agent in Charge were rotated among various agents and that Plaintiff was included in that rotation.  Plaintiff's direct supervisor, Stubblefield, explained that he still allowed Higbie to be acting RAIC; however, there was a rotation among the agents.  *See* Def.'s App. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s App.") 81-82.  Stubblefield

---

[5] Plaintiff also contends that his title of "Senior Criminal Investigator" is equivalent to the position titled "Senior Special Agent" in Plaintiff's Exhibit N.  While the general job description for "Senior Criminal Investigator" did not have a specific job responsibility related to serving as the RAIC, the "Senior Special Agent" job description stated that the agents "act in the capacity of the ASAC or Section Chief in their absence."  *See* Pl.'s App., Ex. N.  Other than his own self-serving statements, Plaintiff does not provide the court any evidence demonstrating that these two jobs are functional equivalents.  Plaintiff does provide the testimony of Scott Bultrowicz; however, no title is given for Bultrowicz.  He explains that the FAHs (for example, the job description for the "Senior Special Agent") applies to civil service personnel.  He also explains comparisons between civil service position classifications and foreign service position classifications.  He never, however, discusses whether Plaintiff's job description is equivalent to that of a "Senior Special Agent."  There is no document that shows the equivalence of the two job titles or one from which the court can reasonably infer that the two titles are functional equivalents.  Therefore, the court will not treat them as equivalents; however, even if they were equivalents, Plaintiff is still on the rotation for serving as the RAIC, and the court would therefore determine that no adverse employment action occurred.

explained that Plaintiff's shortened time in the position was equal to all other agents in the office. *Id*. at 82.

Plaintiff was upset that he did not receive the opportunity to serve as RAIC each time Stubblefield was out of the office; however, Plaintiff was not barred from serving in that position. He was still placed in a fair rotation where he would receive an opportunity to lead. The court determines that this decision made by Defendant was not an adverse employment action. Plaintiff's 2009 work evaluation even stated that he was to act as the RAIC as directed *or* in the absence of the assigned RAIC. Plaintiff produced no evidence that he was to be automatically placed in the RAIC position when the RAIC was out of the office. Additionally, even if the language of his job description stated that he was to "act in the capacity of the ASAC or Section Chief in their absence," Plaintiff was still given the opportunity to serve in that capacity while sharing that role with other agents. This is not the type of decision that would dissuade a reasonable worker from making or supporting a charge of discrimination.

### b.    Defendant's Alleged Stripping of Plaintiff's Title and Rank

Plaintiff also contends that, in January 2011, Defendant stripped him of his title and rank, and the duties, responsibilities, and privileges that came with such title and rank. Plaintiff contends that his immediate supervisor at the time, Taliaferro, took away his "Senior" criminal investigator title in addition to his ranking as the "next senior/agent." Plaintiff also contends that Defendant removed the following job responsibility: "Will act as the Resident Agent in Charge as directed or in the absence of the assigned RAIC." Defendant argues that Taliaferro actually never changed Higbie's title, and Higbie never suffered a demotion, reduction in salary or employment grade. Defendant explains that Taliaferro was simply unfamiliar with why Plaintiff was using the "senior" designation.

After reviewing the relevant documents, the court determines that Higbie's title was never

removed.  Taliaferro explains this fully in his supplemental declaration:

> While reviewing the work statement Higbie provided in early
> 2011, I noticed that Higbie was referring to himself as a "senior
> criminal investigator" and "next senior officer/agent" in the office.
> These designations were unfamiliar to me from my time in DS, so I
> asked Higbie about them, and he informed me that the "senior"
> designations had been awarded to him as part of the settlement of a
> prior EEO case.  I had no knowledge of the settlement and had not
> been working in the Dallas Resident Office at that time.  However,
> upon hearing Higbie's understanding of these matters, I did not direct
> that Higbie's references to being a "senior" criminal investigator or
> agent be removed from his work statement.  Nor did I in any way
> reduce Higbie's employment grade or salary or cause him to be
> demoted.  Instead, I placed a note in a preliminary version of Higbie's
> 2011 work statement about seeking guidance from Human Resources
> about Higbie's exact title and designation.  After conferring with
> officials in the Houston Field Office, I allowed Higbie to keep the
> "senior" designations he preferred, and this was reflected in the final
> version of the 2011 work statement and also in subsequent work
> statements for later years.

Def.'s App. 45.  In some of the e-mails sent by Taliaferro to Plaintiff, he does state the following:

"So if the senior part of the title is important to you[,] we can leave it as is for now and reach out to

HR for guidance and let them make the call.  But the wording about being the next senior person in

the office needs to be removed or changed."  Pl.'s App., Ex. Y-2.  Taliaferro makes it clear, however,

that he allowed Higbie to keep the senior designations that he preferred.[6]  Additionally, Plaintiff

---

[6] As previously stated, the court determined that Plaintiff's "senior" title was not removed.  Additionally, the court determined that Plaintiff's rank as "next senior/agent" rank was not removed; however, even if one were to read Taliaferro's language in his e-mail as removing this rank: (1) Plaintiff has not provided any evidence showing that the rank was in fact removed; (2) no causal link exists between Plaintiff's prior protected activity and this alleged adverse employment action; (3) Defendant had a legitimate, nonretaliatory reason for considering this removal; and (4) Defendant's reason was not pretext for a retaliatory purpose.  Taliaferro explained that Plaintiff's rank "may have come about when DS rolled out the new creds and after [Plaintiff] switched positions, but [Taliaferro] remember[s] them listing 14/2 and above as a supervisory/senior SA and 13/3 and below as SA.  In DS' big picture view, 13/3's are all the viewed the same regardless of length of time on the job.  Plus it's also possible that one of the FS3's assigned to DRO gets promoted to a 2 which would technically make them the next person on the food chain."  Pl.'s App., Ex. Y-2.

mentioned that the language regarding his role as RAIC was taken out of his job description.  In an e-mail provided by Plaintiff, Taliaferro states: "I simplified some wording in the work commitments section to now say 'Will act as RAC as directed' and eliminated the part about the RAC being absent.  I feel it's more clear and to the point. *This refers to the second time it shows up.  The first time it shows up I left the wording as-is." *Id*.  Therefore, Plaintiff's job description was not altered. The court concludes that since (1) Plaintiff was not stripped of his "senior" title,[7] (2) Plaintiff was not stripped of his rank as the "most senior agent," (3) and Plaintiff did not receive any consequential changes to his job description, no adverse employment action occurred.  Furthermore, Plaintiff did not provide any further evidence demonstrating that the actual stripping of his title or rank occurred. Additionally, even if Plaintiff's job description was slightly altered in the way mentioned above, the court determines that these would not be adverse employment actions, as they would not dissuade a reasonable worker from making or supporting a charge of discrimination.

### c.   Defendant's Alleged Removal of Plaintiff's Job Duty as the Primary Liaison to Consular Affairs

Plaintiff contends that Defendant removed his responsibility of serving as primary liaison to Consular Affairs.  Plaintiff argues that he was moved from the upper floor office where he served as liaison for Consular Affairs.  He contends that serving as the primary liaison to Consular Affairs was in his work requirement statement for the 2011 year.  Defendant contends that Taliaferro directed Plaintiff to move his desk from the U.S. Passport Agency's eleventh floor location back to

---

[7] Plaintiff also loosely mentions that, even though Defendants later acknowledge Plaintiff's senior status, Defendant's mere questioning of his status serves as an adverse employment action.  Defendant's alleged denial or questioning would be, at best, a petty slight or minor annoyance, and does not constitute an adverse employment action. *See White*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.") (citation omitted).

the seventh floor space occupied by the Dallas Resident Office, where other agents were located. Defendant argues that all agents within the Bureau of Diplomatic Security (including Plaintiff) located in the U.S. Passport Agency's physical space had the same duties as all other agents in the Dallas Resident Office. Defendant also contends that an agent's duties were not a function of the physical location of the agent's desk. Finally, Defendant explains that Taliaferro confirmed that he did not reduce or take away any of Plaintiff's job responsibilities as a result of the change in desk location.

Plaintiff's Civil Service Performance Plan and Appraisal from February 2011 stated that he would "serve as the DS Representative to the Bureau of Consular Affairs within the Dallas Passport Agency." Pl.'s App., Ex. S. Plaintiff also cites to the deposition of Jason Banks, an assistant regional security officer within the State Department. *See* Pl.'s App., Ex. U. In his deposition, Banks testified that Plaintiff was told to no longer talk to any of the Consular Affairs people. *Id*. at 22. Banks, however, stated: "I would always be secondhand to all the information, so everything that I've heard or what have you, it was all secondhand information. The only thing that I observed would be the fact that, you know, Rick was moved from an upper floor office where he served as liaison for DS to consular affairs." Pl.'s App., Ex. U at 12.

In explaining why Plaintiff had previously been located on the eleventh floor, Stubblefield stated that he initially asked Higbie to move to the eleventh floor because he needed more space on the seventh floor. Def. App. 77. Stubblefield felt more comfortable putting Higbie on the eleventh floor rather than one of the female agents. *Id*. at 77-78. Stubblefield explained that Higbie officed in the U.S. Passport Agency's Office and would help if people needing assistance came into the

office. *Id*. at 78.  He said that even though Plaintiff was officed in the Passport Office, he did not have any extra duties. *Id*. at 79.

Additionally, in his videotaped deposition, Taliaferro was asked: "When you made the decision in March of 2011 to remove [Plaintiff] from the passport office, did you also remove his primary duties in his work requirements as the liaison, the primary liason to the passport office?" Taliferro replied that he did not.  He stated: "Because it was a movement, it was a physical movement as opposed to liaison duties which I was unclear about, what Rick envisioned versus what I envisioned, and I attempted to have conversations with him about that so we could clear that up, but he's   for two years he's refused to do that."  Def.'s App. 55.

The bottom line is that, according to Plaintiff's supervisors, Plaintiff was asked to move his office and did not experience any change in his duties.  According to Banks, Plaintiff's supervisors told him to no longer talk to the individuals within Consular Affairs; however, Banks also said that this was all secondhand knowledge.  Banks's testimony is hearsay, and Higbie did not provide the court with any competent summary judgment evidence that his duties with Consular Affairs were actually eliminated.  While Taliaferro's statement that no agents received extra duties by being in the Passport Agency Office could be seen as inconsistent with Higbie being the liaison to the Passport Agency, Talifaerro's comments regarding "extra duties" were in reference to the agents who were simply physically present in the Passport Agency Office.  In other words, none of the agents who were physically located in the Passport Agency Office was given extra duties by nature of officing in that location.  Plaintiff, however, did have the duty of being the liaison to the Passport Agency, regardless of where he physically officed.  Since there is no evidence that any of Plaintiff's duties were eliminated and the only change was Plantiff's physical office location, the court

**Memorandum Opinion and Order - Page 16**

determines that no adverse employment action occurred, as this change would not dissuade a reasonable worker from making or supporting a charge of discrimination.

To summarize, there were essentially six specific alleged acts that Plaintiff contends were adverse employment actions: (1) Defendant's alleged refusal to permit Plaintiff to act as the RAIC; (2) Defendant's stripping of Plaintiff's title; (3) Defendant's stripping of Plaintiff's rank; (4) Defendant's alteration of Plaintiff's job description for when he serves as RAIC; (5) Defendant's moving of Plaintiff's office; and (6) Defendant's alleged removal of Plaintiff's duty as the primary liaison to the Consular Affairs. The court determines that the second, third, and sixth alleged acts did not occur and are therefore not adverse employment actions. The court also determines that the first, fourth, and fifth alleged acts were not adverse employment actions.

### 3.    Causal Link

The third matter to be determined in a retaliation claim is whether a causal link existed between the protected activity and the adverse employment action. Based on the prior analysis, the court only needs to review the alleged adverse employment actions of (1) Defendant's alleged refusal to permit Plaintiff to act as the RAIC (December 2008); (2) Defendant's alleged alteration of Plaintiff's job description for when he serves as RAIC (January 2011); and (3) Defendant's moving of Plaintiff's office (March 2011). The court previously determined that Plaintiff engaged in protected activity in (1) 2001; (2) January 2008; (3) January 2009; (4) April 2009; and (5) August 2011. The causal link at this stage is less stringent than the "but for" standard required to establish pretext. *See Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation omitted); *see also Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 685 (5th Cir. 2001) (explaining the standard required to

establish pretext and stating that "[w]hile this portion of the analysis may seem identical to the 'causal link' step in the prima facie case, the burden here is more stringent") (citation omitted).

First, when analyzing Defendant's alleged refusal to permit Plaintiff to act as the RAIC in December 2008, the only protected activity that occurred before this alleged act was Plaintiff's EEO claim in 2001. This alleged adverse employment action occurred *seven years* after Plaintiff's protected activity. Not only did the alleged adverse employment action occur seven years after the relevant protected activity, but the supervisor who was involved in the protected activity (Special Agent in Charge Tim Haley) moved from the Houston office to Manama, Bahrain in 2002. Def.'s App. 17. Additionally, the Special Agent in Charge in December 2008 started her position in 2007. The Assistant Special Agent in Charge in December 2008 started his position in 2008. Finally, the Resident Agent in Charge in December 2008 started his position in 2008. The court determines that Defendant's alleged refusal to permit Plaintiff to act as the RAIC is simply too far removed from Plaintiff's protected activity in 2001 and that there is no causal link between the two.

Second, in analyzing Defendant's alleged alteration of Plaintiff's job description when he served as RAIC in January 2011, the protected activities from 2001, January 2008, January 2009, and April 2009 all occurred before Defendant's act. While the evidence does not support that the alteration to Plaintiff's job description actually occurred, and even if it did occur, it was not an adverse employment action. The court, however, continues with the analysis to show that there is no causal link between Plaintiff's protected act and this alleged adverse employment act. Taliaferro was the Resident Agent in Charge of the Dallas Resident Office who allegedly made this change. Taliaferro began working in this capacity in November 2010. Therefore, Taliaferro was not even a supervisor of Plaintiff during his prior protected acts. The court does not believe that Plaintiff has

**Memorandum Opinion and Order - Page 18**

provided sufficient evidence to demonstrate a causal link between Plaintiff's protected acts and Taliaferro's alleged adjustment of Plaintiff's work description.

Finally, when analyzing Defendant's moving of Plaintiff's office in March 2011, the protected activities from 2001, January 2008, January 2009, and April 2009 all occurred before Defendant's act.  Taliaferro is the supervisor who made the decision to move Plaintiff from the eleventh floor to the seventh floor.  Taliaferro began working in this supervising position starting in November 2010.  Therefore, Taliaferro was not even a supervisor to Plaintiff during his prior protected acts. The court does not believe that Plaintiff has provided sufficient evidence to demonstrate a causal link between Plaintiff's protected acts and Taliaferro's order for Plaintiff to relocate his office to the seventh floor.

Although the court concludes that Plaintiff failed to show the requisite causal connection between his prior protected acts and any alleged adverse employment action, the court alternatively determines, for the reasons that follow, Plaintiff fails to establish a genuine dispute of material fact regarding pretext.

### B.       Legitimate, Nonretaliatory Reasons for Challenged Employment Action

Before addressing pretext, the court addresses whether Defendant has articulated and set forth legitimate, nonretaliatory reasons for the acts that Plaintiff deems to be adverse employment actions. The court previously determined that out of the six alleged adverse employment actions[8], three never occurred and the remaining three did not constitute adverse employment actions.  Alternatively, even if one could arguably consider those six adverse employment acts, Defendant has set forth legitimate,

---

[8] In his briefing, Plaintiff formally sets forth three alleged adverse employment acts; however, the court has previously explained that these three were subdivided into six parts for the purposes of its analysis.

**Memorandum Opinion and Order - Page 19**

nonretaliatory reasons for committing the complained-of actions.  Since three of the alleged acts did

not happen, there is no legitimate, nonretaliatory reason to set forth.  The court now analyzes the

reasons set forth by Defendant for the remaining three alleged adverse employment acts.

>1.      **Defendant's Alleged Refusal to Permit Plaintiff to Act as the RAIC**

The court previously examined Defendant's alleged refusal to permit Plaintiff to act as the

RAIC when the active RAIC is out of the office.  The court determined that Plaintiff's contention

that he was refused the opportunity to serve as the RAIC was incorrect and that Plaintiff was instead

placed in a rotation with other agents who would take turns filling this role when necessary.  The

court determines that Defendant has set forth a legitimate, nonretaliatory reason for implementing

this rotation.  Defendant determined that a rotational system was best suited for the operation of the

office, as it enhanced the opportunities for agents to be promoted to different positions.  Defendant

explains that Foreign Service agents were the agents who shared this responsibility with Plaintiff.

According to Defendant, Plaintiff was in a "non-promotable position" simply because Plaintiff's

"GS-1811 Criminal Investigator" position peaks at the GS 13 grade (which was Plaintiff's grade

following his settlement in 2005).  Def.'s App. 29.  In other words, "there is no avenue in a Resident

Office for additional promotions above the GS 13 grade."  *Id*.  Foreign Service agents, on the other

hand, operate "on an 'up or out' promotion-and-retention system, whereby an employee who does

not advance in grade within a certain period of time is involuntarily retired from service."  Def.'s

App. 15.  The rotational system is designed to provide Foreign Service agents with the opportunity

to serve in leadership positions so that they can make themselves more suitable for promotion and

avoid losing their jobs.[9]  For these reasons, the court determines that Defendant has provided a legitimate, nonretaliatory reason for putting Plaintiff in a rotational system for selecting the agents who will serve as the RAIC when the active RAIC is out of the office.

### 2.      Defendant's Alleged Alteration of Plaintiff's Job Description

Plaintiff alleged that the language regarding his role as RAIC was taken out of his job description.  In an e-mail provided by Plaintiff, Taliaferro states: "I simplified some wording in the work commitments section to now say 'Will act as RAC as directed' and eliminated the part about the RAC being absent.  I feel it's more clear and to the point. *This refers to the second time it shows up.  The first time it shows up I left the wording as-is."  Pl.'s App., Ex. Y-2.  First, Plaintiff provides no proof that this adjustment in Plaintiff's job description actually occurred.  Second, even if this change did occur, it is clear that Defendant made the change for the purposes of clarity.   This adjustment is also consistent with Defendant's decision to place Plaintiff in a rotation as discussed above.  For these reasons, the court determines that, even if this adjustment did occur, Defendant set forth a legitimate, nonretaliatory reason for implementing it.

### 3.      Defendant's Moving of Plaintiff's Office

In March 2011, Defendant decided to change the physical location of Plaintiff's desk from the U.S. Passport Agency on the eleventh floor to the Dallas Resident Office's space on the seventh floor.  Taliaferro explained that this change was prompted by his desire to improve his working

---

[9] The court notes that Higbie serving in the RAIC position every time it was available would actually be to the detriment of the Foreign Service agents, as the opportunities for pursuing a promotion would be limited.  Furthermore, even if Plaintiff *was* in a promotable position, the court determines that providing other agents with opportunities to gain leadership experience so that they may be promoted serves as a legitimate, nonretaliatory reason for Defendant's actions.

relationship with Plaintiff.  Def.'s App. 37, 60.[10]  He explained that Plaintiff had previously stated that he did not feel that Taliaferro fully appreciated the amount of work he was accomplishing.  *Id*. Taliaferro also felt that Plaintiff did not keep him fully apprised of his activities so that he could evaluate him accordingly.  *Id*.  For these reasons, the court determines that Defendant articulated a legitimate, nonretaliatory reason for making the move.

### C.      Pretext

Since Defendant articulated and set forth legitimate, nonretaliatory reasons for the alleged adverse employment actions, the inference of retaliation drops from the case.  *Montemayor*, 276 F.3d at 692.  At this juncture, Plaintiff bears the burden of establishing that Defendant's stated reasons were pretexts for the intentional retaliatory conduct.  *McCoy*, 492 F.3d at 557 (citation omitted). "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 133 S. Ct. 2517 at 2533.  If Plaintiff fails to prove, or raise a genuine dispute of material fact, that Defendant's real reason is a pretext for its allegedly retaliatory conduct, Defendant is entitled to summary judgment.  *See McCoy*, 492 F.3d at 561-62.

Plaintiff contends that Defendant has not set forth any legitimate, nonretaliatory reasons for the alleged adverse employment actions that it took against him.  The court disagrees for the reasons previously stated.  At this stage, Plaintiff is required to establish, or raise a genuine dispute of material fact, that Defendant's stated reasons are merely a pretext for intentional retaliation.  The

---

[10] Taliaferro also discussed some of the Passport Agency's concerns regarding communication and Higbie's absences due to illness; however, he does not cite this as a specific reason for the move.

**Memorandum Opinion and Order - Page 22**

evidence produced by Higbie is simply insufficient for a reasonable jury to conclude that the legitimate, nonretaliatory reasons set forth by Defendant are the pretexts for intentional retaliation. For example, Plaintiff contends that the "proposed non-promotable reason for not allowing Higbie to act as the RAIC in his absence makes no sense." Pl.'s Resp. to Def.'s Mot. for Summ. J. 22. As the court has previously stated, even if Plaintiff was in a promotable position, Defendants have articulated a legitimate, nonretaliatory reason for its actions, as the Foreign Service agents deserve an opportunity to serve in leadership positions so that they may become more suitable for promotion. Additionally, Plaintiff continues to argue that Defendant did not acknowledge Plaintiff's title and rank. The court has already established that Defendant *has* acknowledged Plaintiff's senior designations. Accordingly, Higbie fails to raise a genuine dispute of material fact regarding his claims of retaliation under Title VII, the ADA, or the Rehabilitation Act, and Defendant is entitled to judgment as a matter of law on these claims.

### D.      Retaliatory Hostile Work Environment

Plaintiff also asserts a claim of "continuing retaliatory hostile work environment" against Defendant. In his Complaint explaining this claim, Plaintiff states that he "brings suit for discrimination in his employment by Defendant in connection with his prior protected activity, the complaints and disability discrimination lawsuit he filed previously and the subsequent settlement." Pl.'s Third Am. Compl. 36. He also states that he brings this lawsuit "pursuant to the Rehabilitation Act and the ADA and the retaliatory conduct against Plaintiff which has been ongoing and continuous for years . . . ." *Id*. at 36-37. These allegations in his Complaint, in addition to the remaining allegations related to this specific claim, are quite similar to the previous claim of retaliation. Even if these claims were clearly distinct, the Fifth Circuit has not yet decided whether

it will recognize a "retaliatory hostile work environment claim." *See Bryan v. Chertoff*, 217 F. App'x 289, 293 (5th Cir. 2007) ("We need not decide whether to recognize a retaliatory hostile work environment claim or, if such a claim existed, what effects *Burlington Northern* were to have on the plaintiff's burden to prove actionable harm. [Plaintiff] cannot establish a prima facie case of hostile work environment, even under the *Burlington Northern* standard."). *Bryan* explains that a prima facie case of hostile work environment requires the plaintiff to prove, *inter alia*, that "the employee was subject to unwelcome harassment and that the employer should have known of the harassment and failed to take prompt remedial action." 217 F. App'x at 293-294 (citing *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002)). Given that the court previously determined that no adverse employment actions occurred and that, even if they did occur, Defendant had legitimate, nonretaliatory reasons for implementing them, a hostile work environment claim cannot be supported, and therefore, a retaliatory hostile work environment claim certainly cannot stand. For these reasons and given the fact that the Fifth Circuit has not yet determined whether it will recognize a distinct retaliatory hostile work environment claim, the court determines that there is no genuine dispute of material fact as to Plaintiff's retaliatory hostile work environment claim, and the court dismisses this claim with prejudice.

## VI.   Miscellany

Also, before the court is Defendant's Motion to Exclude Improperly-Obtained Documents (Doc. 79), filed June 10, 2013. The court reviewed the alleged improperly-obtained documents and determined that nothing contained in the documents would change its ruling regarding Defendant's

Motion for Summary Judgment.[11]   Accordingly, the court **denies as moot** Defendant's Motion to Exclude Improperly-Obtained Documents.

## VII.   Conclusion

For the reasons stated herein, the court **determines** that no genuine dispute of material fact exists as to Plaintiff's claims for retaliation and retaliatory hostile work environment.  Defendant is therefore entitled to judgment as a matter of law on these claims.  Accordingly, the court **grants** Defendant's Motion for Summary Judgment and **dismisses with prejudice** this action.  Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 14th day of March, 2014.

*Sam A. Lindsay*
Sam A. Lindsay
United States District Judge

---

[11] These alleged improperly-obtained documents relate to the Office of Inspector General's ("OIG") inspection of the State Department's Bureau of Diplomatic Security ("DS") offices.  Defendant contends that these documents are privileged and irrelevant.  Additionally, Defendant argues that these documents are not related to the Dallas Resident Office; rather, these documents concern the "policies, resources, and management controls of the DS office that conducts criminal investigations worldwide."  Def.'s Mot. to Exclude Improperly-Obtained Docs. 4.  Plaintiff argues that these documents are relevant to show that "Agency officials 'promoted' and provided 'Meritorious Service Increases' to 'responding officials' named in Plaintiff's EEO complaints which were then still spending . . . ."  Pl.'s Resp. to Def.'s Mot. to Def.'s Mot. to Exclude 2.  Plaintiff also argues that these documents demonstrate that "discrimination is sanctioned and or perpetrated by senior ranking officials," and that "the Department intentionally misused the process of issuing Final Agency Decisions."  *Id.*  Plaintiff contends that the documents support the fact that there was continuing retaliation in addition to unethical and unlawful behavior.  Plaintiff also argues that these documents demonstrate that officials have failed to recognize Plaintiff's position as Senior Criminal Investigator.  After reviewing the alleged improperly-obtained documents, the court determines that the content of these documents does not change the court's ruling.